# United States Court of Appeals
## For the First Circuit

No. 14-1425

ADA MORALES,

Plaintiff, Appellee,

v.

BRUCE CHADBOURNE, DAVID RICCIO, and EDWARD DONAGHY,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Barron, Circuit Judges.

Stuart F. Delery, Assistant Attorney General, with whom J. Max
Weintraub, Aaron S. Goldsmith, and William C. Peachey were on
brief, for appellants.
Katherine Desormeau, with whom R. Orion Danjuma, Omar C.
Jadwat, Mark W. Freel, Mackenzie Mango, and Lena Graber were on
brief, for appellee.

July 17, 2015

**LIPEZ, Circuit Judge**.    Ada Morales is a naturalized United States citizen who was born in Guatemala.  In May 2009, Morales was imprisoned for 24 hours pursuant to an immigration detainer so agents from the U.S. Immigration and Customs Enforcement ("ICE") could investigate her immigration status.  She brought this action alleging, inter alia, that the ICE agents -- defendants Edward Donaghy, Bruce Chadbourne, and David Riccio -- unlawfully detained her in violation of her Fourth and Fifth Amendment rights.

Donaghy, the ICE agent who issued the detainer, moved for summary judgment on the basis of qualified immunity.  Chadbourne and Riccio, Donaghy's supervisors, moved to dismiss, also on the basis of qualified immunity.  The district court denied the defendants' motions, and they filed this interlocutory appeal.

Donaghy argues that he is entitled to qualified immunity on Morales's Fourth Amendment claim because the law was not clearly established in 2009 that an ICE agent was required to have probable cause before issuing a detainer.  In the alternative, he contends that, if probable cause was required, the law was not clearly established in 2009 that the issuance of the detainer under the applicable circumstances did not constitute probable cause.  With regard to Morales's Fifth Amendment equal protection claim, Donaghy argues that he did not violate her clearly established Fifth

-2-

Amendment rights because he did not detain Morales solely on the basis of her race, ethnicity, or national origin.

Chadbourne and Riccio contend that they are entitled to qualified immunity because Morales failed to allege sufficient facts to plausibly state a supervisory liability claim holding them responsible for allowing their subordinates to issue detainers against U.S. citizens without probable cause in violation of the Fourth Amendment. They further argue that, even if Morales's allegations were sufficient, they did not violate a clearly established Fourth Amendment right.

After review, we agree with Morales that the law was clearly established in 2009 that, under the Fourth Amendment, an ICE agent required probable cause to issue an immigration detainer. We, therefore, affirm the district court's denial of qualified immunity on Morales's Fourth Amendment claim against Donaghy on that issue. Because Donaghy's Fourth Amendment argument regarding the circumstances surrounding the detainer that he issued against Morales and his Fifth Amendment equal protection argument do not present pure issues of law, his appeal on these grounds must be dismissed for lack of appellate jurisdiction. These arguments rely on facts asserted in Donaghy's declarations, and those facts were not among the ones that the district court relied upon in denying Donaghy's motion. Finally, because Morales has sufficiently alleged that supervisors Chadbourne and Riccio violated a clearly

established Fourth Amendment right, we also affirm the district court's denial of qualified immunity on Morales's Fourth Amendment supervisory liability claim against them.  We remand for proceedings consistent with this opinion.

## I.

This appeal addresses both Donaghy's motion for summary judgment as well as Chadbourne and Riccio's motion to dismiss. Because the appeal is interlocutory, the summary judgment standard requires that we "take, as given, the facts that the district court assumed when it denied summary judgment."  Johnson v. Jones, 515 U.S. 304, 319 (1995).  The motion to dismiss standard requires that we draw the facts from Morales's complaint and documents incorporated into the complaint.  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 94 (1st Cir. 2013).  For this appeal, however, the facts are the same regardless of which standard we use.  Because the district court took Morales's allegations as true in deciding both motions, and did not rely on any contrary assertions by the defendants, the pertinent facts for our review are those alleged in Morales's complaint.

Morales is a United States citizen and long-time resident of Rhode Island.  Born in Guatemala, she immigrated to the United States in the 1980s and naturalized in 1995.  Since then, on at least two occasions, she has been detained by government officials pursuant to an immigration detainer, which is a request from ICE to

another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation. See 8 C.F.R. § 287.7(a), (d).

The first incident took place in July 2004. Morales had been arrested by the Cranston, Rhode Island, Police Department at a local K-Mart on charges that were ultimately dismissed. Even though she was a U.S. citizen, ICE issued a detainer against Morales indicating that she was a non-citizen subject to removal. Morales was detained overnight pursuant to the detainer. Her extended detention caused her to miss a flight she had scheduled to visit relatives in Guatemala and to forfeit the $3,000 airfare.

The second incident, and the basis for this action, occurred in May 2009. On May 1, 2009, Morales was arrested while playing with her children in her front yard by the Rhode Island State Police on a warrant for criminal charges relating to alleged misrepresentations in a state benefits application.[1] She was transported to the police station, where a state police officer asked her where she was born and whether she was "legal." Morales responded that she was born in Guatemala and that she was a U.S. citizen. Morales was then transported to the Rhode Island Adult Correctional Institutions ("ACI"), where she was booked into custody.

---

[1] According to the complaint, Morales's criminal charges have been resolved and she remains on probation.

On May 4, 2009, ICE faxed an immigration detainer form to the ACI. The detainer incorrectly identified Morales as an alien whose nationality was Guatemalan, and stated that an "[i]nvestigation has been initiated to determine whether [Morales] is subject to removal from the United States." The detainer further informed the ACI that "[f]ederal regulations (8 C.F.R. § 287.7) require that you detain the alien for a period not to exceed 48 hours . . . to provide adequate time for DHS to assume custody of the alien." The detainer was issued by Donaghy, an ICE agent based in ICE's Rhode Island Office. Donaghy was supervised by Riccio, the Resident-Agent-in-Charge of the Rhode Island office, and Chadbourne, the Field Office Director of the Boston Field Office, which has responsibility over ICE operations in Rhode Island.

Before the detainer was issued, no ICE official interviewed Morales to ask whether she was a U.S. citizen, nor did anyone request documentation from her relating to her citizenship. ICE officials also failed to search federal immigration databases[2] to obtain a copy of her citizenship application or certificate of naturalization.

---

[2] Donaghy claims in declarations attached to his motion for summary judgment and reply brief filed in the district court that he did search federal government databases when investigating Morales's immigration status. The district court, however, did not rely on those declarations in deciding Donaghy's motion. We, therefore, recite Morales's version of the facts. See Johnson, 515 U.S. at 319.

-6-

The same day that ICE sent the immigration detainer to the ACI, a state court ordered Morales released from criminal custody on personal recognizance. Instead of being released, however, Morales was re-booked into ACI custody, strip searched, and kept in jail for 24 more hours based solely on the ICE detainer. When she was notified that her continued detention was based on the detainer, Morales told multiple ACI employees that the detainer was issued in error because she is a U.S. citizen. The ACI employees disregarded her pleas, and she was kept in detention.

On May 5, 2009, ICE agents arrived at the ACI and drove Morales to an ICE office in Warwick, Rhode Island. There, the ICE agents interviewed her, confirmed that she was a U.S. citizen, and released her to her family. Upon releasing her, an ICE agent apologized to Morales, but told her "it could happen again in the future."

On April 24, 2012, Morales filed a civil damages action against defendants Donaghy, Riccio, and Chadbourne, as well as other federal and state defendants who are not parties to this appeal. Morales alleged, inter alia, that, by issuing the detainer against her, Donaghy violated her Fourth Amendment right to be free from unreasonable seizures and her Fifth Amendment equal protection right to be free from discrimination on the basis of race, ethnicity, and national origin. She alleged that Chadbourne and Riccio knew or were deliberately indifferent to the fact that their

subordinates routinely issued ICE detainers without probable cause, and formulated or condoned policies permitting the issuance of detainers without probable cause in violation of the Fourth Amendment. Morales sought damages for these constitutional violations under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), as well as injunctive relief to prevent defendants from subjecting her to unlawful immigration detention again in the future.

In lieu of answering the complaint, defendants filed various motions to dismiss and for summary judgment. As relevant here, Donaghy moved for summary judgment on the basis of qualified immunity on the Fourth and Fifth Amendment claims. Chadbourne and Riccio moved to dismiss Morales's Fourth Amendment supervisory liability claim against them, also on the basis of qualified immunity. On February 12, 2014, the district court denied defendants' motions, and defendants timely filed interlocutory appeals.

## II.

### A. Claims Against Donaghy

#### 1. Fourth Amendment Claim

We begin by addressing Donaghy's contention that he is entitled to qualified immunity on Morales's Fourth Amendment claim. We review de novo a district court's denial of a federal officer's qualified immunity defense. See Hernandez-Cuevas v. Taylor, 723

-8-

F.3d 91, 97 (1st Cir. 2013). To determine whether a defendant is entitled to qualified immunity, we generally proceed through a two-part analysis, considering whether "(1) the facts alleged show the defendant[']s conduct violated a constitutional right, and (2) the contours of this right are 'clearly established' under then-existing law so that a reasonable officer would have known that his conduct was unlawful." Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003).

Donaghy makes two arguments with regard to Morales's Fourth Amendment claim. His first argument implicates only the second prong of the qualified immunity analysis. He contends that the law was not clearly established in 2009 that an ICE agent needed probable cause when issuing a detainer. His second argument implicates both prongs of the qualified immunity analysis. He argues that, if probable cause was required, the undisputed facts of this case demonstrate that he had probable cause, and, moreover, the law was not clearly established in 2009 that these facts fell short of probable cause. We address each argument in turn.

### a. Whether Probable Cause Was Required

A government official's conduct violates clearly established law when, "at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would . . . underst[and] that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083

-9-

(2011) (internal quotation marks omitted). There does not need to be a case exactly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id.; see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Donaghy issued the immigration detainer against Morales pursuant to 8 C.F.R. § 287.7. That regulation authorizes an ICE official to issue a detainer to another law enforcement agency to "seek[] custody of an alien presently in custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Once the alien has completed her criminal custody and is "not otherwise detained by a criminal justice agency," the detainer instructs the agency to "maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays[,] in order to permit assumption of custody by [ICE]." Id. § 287.7(d); see also id. § 287.7(a) (noting that a "detainer is a request that [another law enforcement] agency advise [ICE], prior to release of the alien, in order for [ICE] to arrange to assume custody" of the alien). Thus, the sole purpose of a detainer is to request the continued detention of an alien so that ICE officials may assume custody of that alien and investigate whether to initiate removal proceedings against her.

Longstanding precedent establishes that "[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Davis v. Mississippi, 394 U.S. 721 (1969); Terry v. Ohio, 392 U.S. 1, 16-19 (1968)); see also Dunaway v. New York, 442 U.S. 200, 216 (1979) ("[D]etention for custodial interrogation -- regardless of its label -- intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.").

In Brignoni-Ponce, the Supreme Court applied this well-established principle to determine what standard of proof, if any, an immigration officer must apply to stop and detain individuals to investigate their immigration status. See 422 U.S. at 880-82. In that case, the government argued that, within 100 miles of the border, it had "authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle." Id. at 877. The Supreme Court rejected the government's argument. The Court stated that, just as in the criminal context, an immigration officer "must have a reasonable suspicion" to justify briefly stopping individuals to question them "about their citizenship and immigration status . . . but any further detention . . . must be based on . . . probable

cause." Id. at 881-82 (emphasis added) (citing Terry, 392 U.S. at 29); see also id. at 884 ("[T]he Fourth Amendment . . . forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

Guided by this Supreme Court precedent, we have also required that immigration officers have reasonable suspicion to briefly stop individuals to question them regarding their immigration status and probable cause for any further arrest and detention. See, e.g., United States v. Mendez-de Jesus, 85 F.3d 1, 3 (1st Cir. 1996) (recognizing that Brignoni-Ponce stands for "the principle that an individual may not be [briefly] detained for questioning about citizenship absent reasonable suspicion that the person is an illegal alien"); Lopez v. Garriga, 917 F.2d 63, 69 (1st Cir. 1990) (noting that detention to inquire about an individual's immigration status is "a seizure and implicate[s] the [F]ourth [A]mendment" (citing Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210, 216-17 (1984); Terry, 392 U.S. at 21)); Navia-Duran v. Immigration & Naturalization Serv., 568 F.2d 803, 809 n.7 (1st Cir. 1977) (recognizing that an immigration arrest and detention needs to be "supported by probable cause or reasonable suspicion").

It was thus clearly established well before Morales was detained in 2009 that immigration stops and arrests were subject to

the same Fourth Amendment requirements that apply to other stops and arrests -- reasonable suspicion for a brief stop, and probable cause for any further arrest and detention. Moreover, there could be no question in 2009 that detention authorized by an immigration detainer would require more than just reasonable suspicion. Although the line between an arrest that requires probable cause and a temporary detention for interrogation which does not is not always clear, pre-2009 cases did clearly show that 48 hours of imprisonment -- which is what the detainer requests, see 8 C.F.R. § 287.7(d) -- falls well on the arrest side of the divide. See, e.g., United States v. Place, 462 U.S. 696, 709 (1983) (emphasizing that the Supreme Court had "never approved a seizure of the person for the prolonged 90-minute period involved here" based solely on reasonable suspicion, and "cannot do so on the facts presented by this case"); Manzanarez v. Higdon, 575 F.3d 1135, 1148 (10th Cir. 2009) (explaining that it was unable to find any case in any circuit upholding a detention of longer than 90 minutes based on reasonable suspicion); see also Au Yi Lau v. Immigration & Naturalization Serv., 445 F.2d 217, 222 (D.C. Cir. 1971) (whether an immigration stop of "several minutes" could be justified based solely on reasonable suspicion was a "difficult[]" question, but upholding the stop as it was "minutes rather than hours").

This clear law establishing that the Constitution requires probable cause for the immigration detention that a

-13-

detainer requests is further reinforced by cases interpreting the statute authorizing immigration detainers. Under federal law, immigration officers may arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States" if a "warrant [is] issued by the Attorney General." 8 U.S.C. § 1226(a). Statutory authority for warrantless enforcement actions, including the issuance of detainers, is provided in 8 U.S.C. § 1357. Without a warrant, immigration officers are authorized to arrest an alien only if they have "<u>reason to believe</u> that the alien so arrested is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." <u>Id.</u> § 1357(a)(2) (emphasis added); <u>see also</u> 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has <u>reason to believe</u> that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." (emphasis added)). The provision specifies that in order to issue a detainer for aliens who have violated controlled substances laws, immigration officers require a "<u>reason to believe</u> that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States." 8 U.S.C. § 1357(d)(1) (emphasis added).

Courts have consistently held that the "reason to believe" phrase in § 1357 "must be read in light of constitutional

standards, so that 'reason to believe' must be considered the equivalent of probable cause." Au Yi Lau, 445 F.2d at 222; see, e.g., Tejeda-Mata v. Immigration & Naturalization Serv., 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); United States v. Cantu, 519 F.2d 494, 496 (7th Cir. 1975) ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."); see also United States v. Quintana, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause.").

Based on the "robust consensus of cases [and] persuasive authority" discussed above, al-Kidd, 131 S. Ct. at 2084, it is beyond debate that an immigration officer in 2009 would need probable cause to arrest and detain individuals for the purpose of investigating their immigration status.

Nevertheless, Donaghy contends that he is entitled to qualified immunity because there were no cases in 2009 that specifically held that law enforcement officials required probable cause in the "difficult and unique circumstance" of issuing a detainer. In his view, the issuance of a detainer is factually distinct from other immigration detentions because "[a]n immigration detainer does not itself constitute an arrest," and he

-15-

was "not himself in a position to control" what happened to Morales after he issued the detainer. Appellants' Br. at 27, 28.

First, we pause to note the reason why there were likely no cases in 2009 directly addressing immigration detainers. The government had conceded for years that a detainer must be supported by probable cause. For example, in 1985, the Immigration and Naturalization Service stipulated that a detainer "may only be authorized . . . when the officer has determined that there is probable cause . . . ." Cervantez v. Whitfield, 776 F.2d 556, 560 (5th Cir. 1985). Because the government had agreed that the issuance of a detainer required probable cause, there was never any case or controversy requiring a court to make a determination on this issue. See Cnty. Motors, Inc. v. Gen. Motors Corp., 278 F.3d 40, 43 (1st Cir. 2002) ("The Constitution grants federal courts jurisdiction only over live cases or controversies." (citing U.S. Const., art. III, § 2, cl. 1.)). A ruling in favor of Donaghy would create a perverse incentive that would allow the government to avoid liability by conceding an issue for decades and subsequently arguing that the law was not clearly established on that issue because there were no cases directly on point.[3]

---

[3] In recent years, the government has begun contesting whether a detainer needs probable cause, and courts have uniformly held that probable cause is required. See, e.g., Mendoza v. Osterberg, No. 8:13CV65, 2014 WL 3784141, at *6 (D. Neb. July 31, 2014); Gonzales v. ICE, No. 13-04416, Dkt. 42, at *12 (C.D. Cal. July 28, 2014); Miranda-Olivares v. Clackamas Cnty., No. 3:12–cv–02317-ST, 2014 WL 1414305, at *9–11 (D. Or. Apr. 11, 2014); Uroza v. Salt

As to Donaghy's latter point, while a detainer is distinct from an arrest, it nevertheless results in the detention of an individual. See 8 C.F.R. § 287.7. Morales alleges that after her criminal custody had terminated, she was detained for 24 additional hours based solely on the detainer issued by Donaghy. Because Morales was kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth Amendment purposes —- one that must be supported by a new probable cause justification. See Illinois v. Caballes, 543 U.S. 405, 407-08 (2005); Arizona v. United States, 132 S. Ct. 2492, 2509 (2012) ("[D]elay[ing] the release of some detainees for no reason other than to verify their immigration status . . . would raise constitutional concerns.").

Moreover, although Morales continued to be detained by ACI officials, and not by Donaghy himself, it was also clearly established that a law enforcement officer is "responsible for the natural consequences of his actions." Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)); see also id. at 344-45 (holding that "an officer whose request for a warrant allegedly caused an unconstitutional arrest" can be held liable for the arrest where "the warrant application is

Lake Cnty., No. 2:11CV713DAK, 2013 WL 653968, at *6 (D. Utah Feb. 21, 2013); Galarza v. Szalczyk, No. 10-cv-06815, 2012 WL 1080020, at *10, *13 (E.D. Pa. Mar. 30, 2012) rev'd on other grounds, 745 F.3d 634 (3d Cir. 2014).

-17-

so lacking in indicia of probable cause as to render official belief in its existence unreasonable"); <u>Torres Ramirez</u> v. <u>Bermudez Garcia</u>, 898 F.2d 224, 228 (1st Cir. 1990) (holding that an officer who knowingly processed an invalid warrant could be held liable for the subsequent unlawful arrest). The natural consequence of Donaghy issuing the detainer was that Morales would be detained for up to 48 hours. Donaghy cannot argue otherwise. The detainer he issued, on its face, instructed ACI officials to "detain the alien for a period not to exceed 48 hours."

Donaghy also never explains why detainers present such "difficult and unique" circumstances as to allow him to circumvent the Fourth Amendment's probable cause requirement. Indeed, we do not understand why it would be more difficult to obtain the facts necessary to establish probable cause for an individual who was detained in criminal custody than for an individual who was walking freely in the community. Arguably, it would be easier to establish probable cause in the case of detainers, because immigration officers would have easier access to interview and obtain records from an individual detained in criminal custody. Here, although federal regulations permit an immigration officer "to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual," 8 C.F.R. § 287.8(b)(1), Donaghy admits that he "never met or even talked to Ms. Morales before issuing an ICE detainer" against her. Appellants' Br. at 33.

Donaghy's argument implies that a reasonable officer in 2009 could have issued an immigration detainer against an individual for any reason -- or no reason whatsoever. Notably, Donaghy does not argue that reasonable suspicion or some other lower evidentiary standard applied to detainers in 2009. Instead, he contends that it was not clearly established that the Fourth Amendment would apply at all. Donaghy states that "a reasonable officer in 2009 could have thought that the constitutional standards . . . were not applicable to the issuance of the detainer." Id. at 27. This unprecedented proposition is contradicted by longstanding Fourth Amendment jurisprudence. See, e.g., Dunaway, 442 U.S. at 214-15 ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'"). Donaghy's contention simply has no support in our case law. To the contrary, the law was clearly established that Donaghy required probable cause to detain Morales pursuant to an immigration detainer. Cf. Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 94 (1st Cir. 2002) ("We have no doubt that there is a clearly established constitutional right at stake, although we have found no case exactly on all fours with the facts of this case.").

## b. Whether Donaghy Had Probable Cause

Donaghy contends that, even if probable cause was required, he is entitled to qualified immunity because he had probable cause when issuing the detainer against Morales, or, at the very least, the law was not clearly established in 2009 that the circumstances applicable to the issuance of the detainer did not constitute probable cause. Donaghy's argument relies on sworn declarations that he attached to his motion for summary judgment and reply brief in the district court. In those declarations, Donaghy contends that he made the decision to issue the detainer after reviewing various state and federal computer databases and determining that Morales was a non-citizen who had "entered the United States without inspection and [was] present in the United States without authorization." Donaghy Decl., Dkt. 20-3 at 2, No. 1:12-cv-00301-M-DLM (D.R.I. filed Sept. 4, 2012). In particular, Donaghy asserts that he analyzed the ACI's database and two federal databases, the Central Index System and the National Crime Information Center databases. After reviewing these databases, he "concluded that Morales was born in Guatemala, that she had made no claim of being a United States citizen, and that there was probable cause to issue an ICE detainer against her." Second Donaghy Decl., Dkt. 47-1 at 2, No. 1:12-cv-00301-M-DLM (D.R.I. filed Jan. 19, 2013).

As we have said time and again, "[w]e have jurisdiction over an interlocutory appeal of a denial of summary judgment on qualified immunity only insofar as the appeal rests on legal, rather than factual grounds." Cady, 753 F.3d at 350 (citing Johnson v. Jones, 515 U.S. 304, 313 (1995)); Goquen v. Allen, 780 F.3d 437, 438 (1st Cir. 2015) (dismissing interlocutory appeal for want of appellate jurisdiction because defendants' arguments "take issue with the district court's factual assessments and do not present a pure issue of law for this court's consideration"); Penn v. Escorsio, 764 F.3d 102, 111 (1st Cir. 2014) (holding that jurisdiction for interlocutory appeal was lacking where defendants' arguments rested on factual, not legal, grounds).

In this case, Morales disputes that Donaghy and his fellow ICE agents conducted a sufficient database search with regard to her citizenship status. The complaint alleges that "federal immigration authorities maintain records of naturalization applications in their databases," and "ICE could easily have accessed the information in its possession and confirmed that Ms. Morales was a U.S. citizen before subjecting her to a detainer in 2009." Compl. ¶ 40. She specifically alleges that Donaghy "failed to sufficiently investigate Ms. Morales's immigration status before issuing the detainer." Id. ¶ 38. She adds that Donaghy "could have easily conducted further research to verify whether Ms. Morales was a U.S. citizen, but he failed to do so." Id. ¶ 39.

Also, Morales has not had the opportunity to conduct *any* discovery to assess the credibility of the assertions that Donaghy made in his declarations.

Therefore, Donaghy would like us to grant him qualified immunity based on his own version of the facts, even though the district court did not accept Donaghy's version of the facts. He fails to understand that in exercising our interlocutory appellate jurisdiction, we are required to "take, as given, the facts that the district court assumed when it denied summary judgment." Johnson, 515 U.S. at 319.

Because Donaghy's argument clearly rests on factual grounds and does not present a pure issue of law, his appeal on this ground "must be dismissed for want of appellate jurisdiction."[4] Goguen, 780 F.3d at 438; see also Johnson, 515 U.S. at 317 (stating that "an interlocutory appeal . . . makes unwise use of appellate courts' time" when it "forc[es] them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision").

### 2. Fifth Amendment Claim

Donaghy also argues that he is entitled to qualified immunity on Morales's Fifth Amendment equal protection claim.

---

[4] Donaghy does not make any argument that probable cause existed even on the facts that the district court assumed to be true.

Morales alleges that Donaghy based his decision to issue a detainer against her solely on her Guatemalan origin and/or her Spanish surname, which violated her Fifth Amendment equal protection right to be free from discrimination on the basis of race, ethnicity, and national origin. Donaghy contends that he is entitled to qualified immunity because, on the facts of this case, he did not detain Morales solely on the basis of these protected traits, and, therefore, did not violate her clearly established Fifth Amendment rights.

Relying once again on the declarations he attached to his motion for summary judgment and reply brief in the district court, Donaghy argues that he issued the detainer against Morales based primarily on the database searches that he conducted. He stated that he issued the detainer after determining she was born in Guatemala "[b]ecause there was no record [that Morales had] any prior encounter with ICE, no record of Morales applying for immigration benefits, including naturalization, and evidence of at least one alias with multiple social security numbers." Donaghy Decl., Dkt. 20-3 at 2. Donaghy added that he "did not issue the detainer to discriminate against Morales on the basis of race, ethnicity, or national origin, or on any other basis." Id. He contends that "this appeal involves solely a question of law" regarding "whether an officer may constitutionally rely, in part, on an individual's birth in a foreign country in determining

whether to issue a detainer."  Appellants' Reply Br. at 25 (emphasis added).

Donaghy's contention misses the point.  His argument that he only relied "in part" on Morales's foreign birth is based entirely on his self-serving declarations.  Donaghy requests that we reject the district court's "finding that he issued the ICE detainer solely because Ms. Morales was born in a foreign country," Appellants' Br. at 33, based on his declarations even though the district court did not credit those declarations in denying Donaghy's motion for summary judgment.  We simply do not have appellate jurisdiction to entertain Donaghy's argument at this time.  See Escorio, 764 F.3d at 111 (stating that "we have no basis on which to exercise jurisdiction" because "nowhere in the defendants' brief does there appear any developed argument that the defendants are entitled to summary judgment even if the district court's conclusions about the record were correct" (internal quotation marks omitted)).

## B. Claim Against Chadbourne and Riccio

Chadbourne and Riccio contend that they are entitled to qualified immunity on Morales's Fourth Amendment supervisory liability claim against them.  In reviewing the district court's denial of their motion to dismiss, we analyze, first, whether the facts alleged in the complaint "show the defendants' conduct

violated a constitutional right," and second, whether that right was "clearly established" in 2009.  Santana, 342 F.3d at 23.

Morales alleges that ICE supervisors Chadbourne and Riccio violated her Fourth Amendment rights because they knew or were deliberately indifferent to the fact that their subordinates routinely issued immigration detainers against naturalized U.S. citizens without probable cause, and formulated or condoned policies permitting the issuance of detainers without probable cause.  Defendants argue that Morales has failed to allege sufficient facts to plausibly state a supervisory liability claim.

A supervisor may be held liable for the constitutional violations committed by his subordinates where "an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation."  Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) (internal quotation marks omitted).  A plaintiff can establish that "affirmative link" by alleging that the supervisor was "a primary violator or direct participant in the rights-violating incident," or that "a responsible official supervises, trains or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."  Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (internal quotation marks omitted).

-25-

Morales alleges that ICE agents in Rhode Island maintained a practice of "routinely collaborat[ing]" with state law enforcement authorities "to issue and enforce detainers against U.S. citizens, particularly naturalized U.S. citizens, . . . without sufficient investigation into their citizenship or immigration status and without probable cause to believe that they are non-citizens subject to removal and detention." Compl. ¶ 67. The complaint further alleges that when an individual is arrested at the ACI and "provide[s] a foreign country of birth, has a foreign-sounding last name, speaks English with an accent, and/or appears to be Hispanic," ICE agents "often fail sufficiently to investigate the arrestee's citizenship or immigration background before issuing an immigration detainer . . . without probable cause to believe that the individual is a noncitizen subject to detention and removal by ICE." Id. ¶¶ 69-70.

The complaint further alleges that Chadbourne and Riccio, as the heads of the ICE Boston Field Office and Rhode Island sub-office, "knew or should have known that their subordinates, including Defendant Donaghy, regularly . . . issued immigration detainers against individuals such as Ms. Morales, without conducting sufficient investigation and without probable cause to believe that the subject of the immigration detainer was a non-citizen subject to removal and detention." Id. ¶ 81. The complaint adds that Chadbourne and Riccio "formulated, implemented,

encouraged, or willfully ignored [ICE's] policies and customs [in Rhode Island] with deliberate indifference to the high risk of violating Ms. Morales's constitutional rights" and failed to "change[] these harmful policies and customs" although they "had the power and the authority to change [them] by, for instance, training officers such as Defendant Donaghy to perform an adequate investigation into individuals' citizenship and immigration status before issuing detainers."  Id. ¶¶ 84-85.

Relying on the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), Chadbourne and Riccio contend that Morales's allegations are conclusory and fail to establish an affirmative link between Donaghy's behavior and their action or inaction.  In Iqbal, the Supreme Court held that the plaintiff, Javaid Iqbal, had not alleged a plausible supervisory liability claim against Attorney General John Ashcroft and FBI Director Robert Mueller under Federal Rule of Civil Procedure 8.  See 556 U.S. at 680-82.  Iqbal alleged that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  Id. at 680 (internal quotation marks omitted).  The Supreme Court rejected "[t]hese bare assertions" as conclusory because they "amount to nothing more than 'a formulaic recitation of the elements' of a constitutional

discrimination claim." Id. at 681 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

We reject Chadbourne and Riccio's argument because, unlike the conclusory allegations in Iqbal, the allegations in Morales's complaint are based on factual assertions that establish the affirmative link necessary to sufficiently plead a supervisory liability claim. Morales alleges that, as a U.S. citizen, she has been detained pursuant to an immigration detainer "on at least two separate occasions" in July 2004 and May 2009. Compl. ¶¶ 11-13. Furthermore, during the second encounter, Morales informed ICE agents that "she had been erroneously detained by ICE on a previous occasion . . . and that she was afraid that it may happen again." Id. ¶ 61. The ICE agents "reinforced [her] fear, stating that it could happen again in the future" even though they had just verified she was a U.S. citizen. Id. The agents "never told Morales that ICE would correct the problem or take any steps to ensure that she would not be subject to wrongful detention again in the future." Id. Finally, after Morales's release, Joan Mathieu, an immigration attorney, contacted ICE's Rhode Island office to learn more about why an immigration detainer had been issued against Morales. Id. ¶ 66. An ICE agent told Mathieu that "the erroneous detention of U.S. citizens" pursuant to immigration detainers "happens not infrequently." Id. The agent added that "ICE routinely issues detainers" against naturalized U.S. citizens

-28-

and that "if Ms. Morales is arrested again, ICE will likely put a detainer on her."  Id.

Based on these detailed allegations -- combined with the previously highlighted allegations discussing Chadbourne and Riccio's specific roles -- and drawing all reasonable inferences in favor of Morales (which we must do at the motion to dismiss stage), it is plausible that Chadbourne and Riccio either formulated and implemented a policy of issuing detainers against naturalized U.S. citizens without probable cause or were deliberately indifferent to the fact that their subordinates were issuing detainers against naturalized U.S. citizens without probable cause.  Thus, Morales has sufficiently alleged that Chadbourne and Riccio, through their action or inaction, permitted their subordinates, including Donaghy, to issue detainers without probable cause in violation of the Fourth Amendment.[5]

---

[5] We also find that this Fourth Amendment right was "clearly established" in 2009.  Santana, 342 F.3d at 23.  As explained above, the law was clearly established in 2009 that an immigration officer needed probable cause to issue a detainer.  Furthermore, the law was also clearly established that a supervisor may be held liable for unconstitutional actions of a subordinate if he "supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999).  A supervisor may also be held liable for "formulating a policy, or engaging in a custom, that leads to the challenged occurrence." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).  Although there were no specific cases in 2009 directly addressing a supervisor's liability with regard to the issuance of immigration detainers, it is beyond debate that a supervisor who either authorized or was deliberately indifferent to his

For the reasons stated above, we <u>affirm</u> the district court's denial of qualified immunity on Morales's Fourth Amendment claim against Donaghy on the ground that the law was clearly established in 2009 that an ICE agent required probable cause to issue an immigration detainer.  We <u>dismiss</u> Donaghy's appeal on his Fourth Amendment argument regarding the circumstances surrounding the issuance of the detainer and his Fifth Amendment equal protection argument for want of jurisdiction.  We also <u>affirm</u> the district court's denial of qualified immunity on Morales's Fourth Amendment supervisory liability claim against Chadbourne and Riccio.  We <u>remand</u> for proceedings consistent with this opinion.

<u>So ordered.</u>

---

subordinate's issuance of a detainer without probable cause could be held liable for violating the Fourth Amendment.  <u>See</u> <u>Hall</u>, 817 F.2d at 925 ("The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability.").